In re LMS HOLDING COMPANY, an Oklahoma corporation, Petroleum Marketing Company, an Oklahoma corporation, Retail Marketing Company, an Oklahoma corporation, Debtors.

LMS HOLDING COMPANY, an Oklahoma corporation; Petroleum Marketing Company, an Oklahoma corporation; and Retail Marketing Company, an Oklahoma corporation, Plaintiffs,

v.

UNITED STATES of America, ex rel. INTERNAL REVENUE SERVICE; Core–Mark Mid–Continent, Inc., an Arkansas corporation, f/k/a Mid–Continent Distributors, Inc., a/k/a Core–Mark Distributors; Amcon Distributing Company, a Delaware corporation; American Express Travel Related Services Company, Inc.; and Chrysler Diversified Credit, Inc., Defendants.

Bankruptcy Nos. 91–03412–C to 91–03414–C.
Adv. No. 92–0242–C.

United States Bankruptcy Court, N.D. Oklahoma.

May 7, 1993.

Thomas A. Creekmore, Tulsa, OK, for plaintiffs.

J. Joseph Raymond, Washington, DC, for USA/IRS.

Todd M. Henshaw, Tulsa, OK, for Core–Mark and Amcon.

Mark W. Kuehling, Oklahoma City, OK, for American Exp. Travel Related Services.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

This matter comes on to be heard upon the adversary complaint filed by the Debtors concerning the secured status of the Defendants' claims. The parties before the Court at this time are LMS Holding Company, Petroleum Marketing Company and Retail Marketing Company (collectively referred to as "the Debtors"), and Defendants, Core–Mark Mid–Continent, Inc. ("Core–Mark") and Amcon Distributing Company ("Amcon").

### UNDISPUTED FACTS

1. On August 11, 1989, the Debtors acquired certain assets from the Chapter 11 bankruptcy estate of MAKO, Inc. ("MAKO"), pursuant to MAKO's liquidating plan which was confirmed by the Bankruptcy Court in the Eastern District of Oklahoma.

2. Prior to commencement of the MAKO bankruptcy, the Defendants were creditors of MAKO. The Defendants each had a security agreement with MAKO which granted them a security interest in MAKO's inventory and after-acquired inventory.

3. Prior to MAKO's bankruptcy filing, the Defendants had filed financing statements naming MAKO as the Debtor in order to perfect their respective security interests in the above-described collateral.

4. After filing bankruptcy, the Defendants' claims were dealt with in MAKO's liquidating plan. The plan provided that the Defendants were holders of "Allowed Secured Claims." The plan also provided that the Defendants would retain their respective security interests on the property covered by their security agreements and transferred to the Debtors.

5. The Debtors acquired MAKO's property subject to the Defendants' liens as provided for in the MAKO plan. The property acquired by the Debtors included the inventory in which the Defendants had perfected security interests.

6. The Defendants had notice of the MAKO bankruptcy, participated in the administration of the estate, were represented by counsel, and were aware of the formulation and confirmation of the MAKO plan, including the sale of the MAKO inventory to the Debtors.

7. Neither Defendant objected to confirmation of the MAKO plan which was confirmed in August 1989.

8. Subsequent to confirmation, the Defendants received from the Debtors a plan note in the amount of $175,000.00 to Core–

Mark and $106,000.00 to Amcon. The Debtors also executed a new security agreement in favor of each Defendant covering the inventory purchased and future-acquired inventory.

9. Neither Defendant filed new UCC 1 Financing Statement or other evidence of its respective security interest in the MAKO inventory naming the Debtors as the new owner of the collateral.

10. Following the sale to the Debtors, the inventory was sold in the ordinary course of business and replaced with new inventory.

11. Following the sale, the Debtors did not do any new business with Core–Mark or Amcon. However, the Debtors made regular monthly payments on its obligations.

12. On September 27, 1991, the Debtors filed separate bankruptcy petitions under Chapter 11 of the Bankruptcy Code, which are being jointly administered in this Court.

13. On the date of bankruptcy, Core–Mark's claim against the Debtors was $160,248.00 and Amcon's claim was $96,163.98. Both claims are oversecured claims if their security interests are determined to be valid.

## CONCLUSIONS OF LAW

▇▇▇ The first issue to be determined is whether the Defendants' security interests in MAKO's inventory continued when that inventory was sold to the Debtors pursuant to MAKO's liquidating plan with the Defendants' knowledge and consent.

This issue is answered in the affirmative. Section 9–306(2) of the Uniform Commercial Code ("UCC"), provides in part as follows:

[A] security interest continues in collateral, notwithstanding sale, ... unless the disposition was authorized by the secured party in the security agreement or otherwise.

Under this provision of the Code a transferee acquires collateral free and clear of a pre-existing security interest only if the disposition of the collateral was authorized by the secured party to be free and clear of the security interest. If the disposition was not authorized by the secured party or if the disposition was authorized subject to the security interest, the transferee will not acquire the collateral free and clear of the security interest. 12A O.S.Supp.1993 § 9–306(2)[1]. In this case, Core–Mark and Amcon *authorized* the sale of their collateral to the Debtors *subject to their security interests*. Therefore, the Defendants' security interests survived the sale from MAKO to the Debtors and continued in the inventory sold.

The second issue is whether the Defendants' security interests continue in the after-acquired inventory of the Debtors or are limited to the inventory that was in existence at the time of the sale.

The Defendants' security agreements with MAKO granted them a security interest in after-acquired inventory. Specifically, Core–Mark received a security interest in "the inventory of Debtor, ... now owned or hereafter acquired and held for sale or lease" and Amcon received a security interest in "[a]ll inventory of Debtor, whether now owned or hereafter acquired and located, held, furnished, used, or consumed now or hereafter ... [t]ogether with all substitutions and replacements for any of the foregoing property."

The UCC clearly provides that a security agreement is enforceable between the parties according to its terms. Section 9–201. Additionally, it is permissible under the UCC to grant a security interest in future-acquired collateral. Section 9–204. Finally, § 9–306(2) states that a security interest continues in "collateral" following its transfer. Collateral is defined as "property subject to a security interest." Section 9–105. In this case, the property subject to the Defendants' security interests included both inventory in existence and that acquired in the future. *In re Taylorville*

1. *See also J.I. Case Credit Corp. v. Crites*, 851 F.2d 309 (10th Cir.1988); *In re Southern Properties, Inc.*, 44 B.R. 838 (Bankr.E.D.Va.1984); *In re Neatex*, 77 B.R. 808 (Bankr.D.Nev.1987); and *Permanent Editorial Board Commentary* ("PEB") No. 3 to § 9–306 (March 10, 1990).

*Eisner Agency, Inc.,* 445 F.Supp. 665, 668 (S.D.Ill.1977).

■ When the Debtors purchased the assets from the MAKO bankruptcy estate pursuant to the liquidating plan, it took the assets subject to the security interests of Core–Mark and Amcon. As a result, whatever rights Core–Mark and Amcon had against MAKO they now have against the Debtors. Under their security agreements with MAKO, Core–Mark and Amcon had a security interest in future-acquired inventory. Consequently, Core–Mark and Amcon retain that right against the Debtors.

It is stipulated that the inventory purchased by the Debtors from the MAKO estate no longer exists because it has been sold. However, the Debtors have acquired new inventory. Debtors argue that the security interests of Core–Mark and Amcon are good only against the inventory in existence on the date of the sale.[2]

The Court rejects the Debtors' argument. As the Court stated above, when the Debtors purchased the assets of MAKO, they purchased those assets subject to the Defendants' security interests in the collateral described in their security agreements, which included after-acquired inventory. By acquiring the MAKO assets subject to the Defendants' security interests, the Debtors effectively stepped into the shoes of MAKO and are thus bound to the terms of the security agreements. The Debtors' attempt to limit the extent of the Defendants' security interests to inventory actually acquired from the MAKO estate is inconsistent with both the UCC and the terms of the security agreements. Nothing in the UCC imposes such a limitation and the security agreements cover both inventory in existence and that acquired in the future.

■ The last issue is whether Core–Mark and Amcon, which had properly perfected security interests against MAKO, had to file a new financing statement in the Debtors' name to remain perfected after the sale.[3] The Court answers this question in the negative. Pursuant to the third sentence of § 9–402(7), Core–Mark and Amcon did not have to reperfect by filing a financing statement in the name of the Debtors. The third sentence of Section 9–402(7) provides as follows:

A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

■ This sentence continues the perfection obtained by the original filing upon transfer of collateral to a third party. In the Uniform Commercial Code comment, PEB Commentary No. 3 dated March 10, 1990, it is stated:

Subsection 7 also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another. This question has been much debated both in pre-Code law and under the Code. This Article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it.

Therefore, the security interests of the Defendants remained perfected in the collateral transferred without the necessity of refiling a financing statement in the Debtors' name. In accordance with the above discussion, collateral includes both present and future acquired inventory. *In re Southern Properties, Inc.,* 44 B.R. 838 (Bankr.E.D.Va.1984).

■ The Debtors have raised other issues in their adversary complaint, one of which is that Core–Mark did not timely file a proof of claim and therefore its claim

---

**2.** Both parties relied on § 9–402(7) for the proposition that the Defendants' security interests continued or did not continue in after-acquired property following the sale. Reliance on this section is misplaced. Section 9–402(7) deals only with *perfection* of a security interest following a transfer of the collateral. It is not concerned with the issue of whether a security interest exists or continues in collateral subject to a security interest following its transfer.

**3.** The Court previously ruled on this matter in an interlocutory order dated February 23, 1993, which did not set forth the Court's reasoning.

should be disallowed. This argument was previously rejected by the Court because a secured creditor does not lose its lien by failure to timely file a proof of claim. *See* 11 U.S.C. § 506(d)(2); *In re Fernwood Markets,* 76 B.R. 501 (Bankr.E.D.Pa.1987); *In re Thomas,* 91 B.R. 117 (Bankr.N.D.Ala. 1988). The only consequence of failing to timely file a proof of claim is that the creditor can only receive the value of its collateral and cannot get an unsecured deficiency. In this case, Core–Mark's claim is oversecured and therefore its failure to timely file a proof of claim will not effect its recovery.

The Debtors also seek to recover alleged preferential payments made to Core–Mark and Amcon within the ninety days preceding bankruptcy. This issue is rendered moot by the above ruling of the Court that Core–Mark and Amcon have oversecured claims against the Debtors. Therefore, Core–Mark and Amcon will not receive more than they would receive under a Chapter 7 liquidation.

A separate Judgment Order will be entered consistent with this Memorandum Opinion.